Thank you, Mr. Chief Justice, and may it please the Court. Section 1391 creates a clear timing rule. Withdrawal liability is based on the plan's unfunded vested benefits as of the end of the prior year. The statute then defines unfunded vested benefits as the value of the plan's non-forfeitable benefits minus the value of the plan's assets. That first number is the present value of decades of future pension payments. So the assumptions that the plan actuary makes about the future are a crucial part of what determines that number. Changing the assumptions changes the present value and thus changes the amount of unfunded vested benefits. But under the statute's timing rule, that amount is frozen on the valuation date. Later changes in that amount cannot factor into the employer's liability. That's just as true for changes caused by new assumptions as it is for changes from any other component of the computation. Respondents argue that until recently, actuaries have often selected withdrawal liability assumptions after the valuation date. It's not clear if that's true, but even if it is, it doesn't alter the meaning of the statutory text. And respondents themselves concede that plans and actuaries can readily alter the meaning of the statutory text. I welcome the Court's questions. Were petitioners surprised by the valuation or did they know about it before they withdrew? The record's not clear for all of the petitioners. Several of the petitioners did receive estimates in 2018 that used the new assumptions, but they were surprised when they received those estimates to see that the discount rate used was not the one that they understood the plan to have had in the prior year. So is the discount rate the major factor in the cost differential? Yes, it is, Your Honor. And that's because of the compounding of interest over time, and it has an exponential effect on the amount. What is the exact language that you're relying on that pegs this as the date of the valuation? It's the language in 1391, unfunded vested benefits as of the end of the plan year preceding the plan year in which the employer withdraws. There's also additional language setting the same date in different parts of the statute, but it's that as of the end of the plan year that is the cutoff date under the statute. I'm not even sure this applies to this thing, but let's say on January 31st, you know, the companies have given in all their information, December 31st, and on January 1st, one of the companies mails in and says, you know, we forgot to count all of our accountants because they're based somewhere else. There's 55 of them. You should add them to the numbers we sent you. Can the pension fund do that? Yes, Your Honor. The key point in our view of the statutory language is that all of the inputs that go into the computation of unfunded vested benefits have to be frozen or fixed on the December 31st date. And so there are objective facts out in the world, like the amount of planned assets or the number of retirees. Those are all just facts out in the world that can't be changed because of what someone thinks about them. But actuarial assumptions are fundamentally unlike that. They are judgments not only about 10 to 40 years of future experience of the plan, but they can often embody normative judgments as well, such as how withdrawing employers should bear the cost of the plans under funding relative to the employers who continue to contribute to the plan. So numbers that should have been counted but weren't as of December 31st, you can't go back and put those in. But assumption about how you should calculate, for example, numbers of employees when you can't just go by and count them, you can't change that. Well, I don't think there's an assumption about the number of employees. The line I would draw is between the facts that are immutable, that are out in the world, they're objective facts, and the things that are actually the product of the mental judgment of a particular person, the actuary that's hired by the plan to play this role. And if that determination about what the plan's investments will return over 20 to 40 years into the future isn't made by the cutoff date, our view is that it shouldn't factor into the analysis because it would be changing what the unfunded vested benefits are after the valuation date. Mr. Connealy, why would that be? Because you acknowledged to the Chief Justice that the facts can come in later so long as they're as of December 31st, and an actuary trying to figure out what the unfunded vested benefit is, you know, has to calculate out into the future. Given that set of information, he can't use different information. So what's impermissible about that? I mean, he's trying to figure out what the appropriate discount rate is given the information on December 31st. I think the difficulty with that, Your Honor, is that it defines actuarial assumptions too narrowly. They don't only predict in an objective way what the plan's experience over decades will be. When, as here, the assumptions we're dealing with are specific to withdrawal liability, they also reflect the actuary and the plan's preferences for policy decisions, such as the relative burden borne by withdrawing employers versus contributing employers. And so it's not simply an objective assessment of what's true out in the world. It's actually changing what the plan's approach normatively will be. Does that help you or hurt you? I mean, is it your argument that the actuary who is making these kinds of judgments that are themselves not really inputs, because they're not just the hard data, I see that and I think the other side would agree, but why then can't the actuary be making those judgments later? Isn't the as of only with respect to the hard data and the things that the actuary then needs to look at in order to be making his judgment? No, Your Honor. Under the text, unfunded VESTA benefits are the thing that's as of the measurement date. And unfunded VESTA benefits are defined by Section 1393C as the present value of non-forfeitable benefits minus the value of plan assets. No one thinks that changes in the value of plan assets after the measurement date could factor into an employer's withdrawal act. I understand, but the question here is whether the assumptions that the actuary is making in order to assess the value of the unfunded VESTA benefits have to be selected. These assumptions have to be made during the planned year or whether those assumptions can come later. And what is confusing me about your argument is that I understood from the statute that the statute at times requires annual reporting of this information. So actuaries are doing this on an ongoing basis, not just with withdrawal. And the statute gives like seven months after the end of the plan for this information about unfunded benefits to come in with respect to these annual reports, suggesting that even Congress understood that it was going to take a while, that there were going to be things that are assessed retrospectively in that seven-month period. So why isn't that just what's happening here? And the fact that that is the way the statute works undermines your view that those calculations have to be and assumptions have to be made in the actual planned year. In the reporting requirements in ERISA, Your Honor, there is no specific valuation date that plans are required to use when preparing their form. But they're doing annual reports, right? So it's not the previous year? They get to choose a valuation date within the previous year and the month before. So it's up to them. It's not specified in the statute. 1391 is very clear that there is a specific valuation date that has to govern the calculation of withdrawal liability. And our view is that to apply that rule, that as of language consistently, all of the inputs that go into the computation, including the assumptions, which really are an input, they're part of what the actuary plugs into the model. No, but you said, you already said that the assumptions are something else, that they are the actuary's best judgment based on of what the future performance of this plan was going to be. I was with you on that. And so as a result, it seems to me that this is something different than the inputs. Well, I think it is an input. It's kind of like the curve that a teacher might use in grading exams. It determines what the ultimate value will be. And in that respect, if you change that factor in the calculation, you'll end up with a different number. But it is an input. It does predict 20 to 40 years of future experience. It also embodies, as in this case, the PowerPoint presentation that the actuary presented to the trustees, says that on JA-176, that there's a tradeoff between providing more protection to contributing employers versus being harsher toward withdrawing employers. And that has long-term implications for how the plan will conduct itself. But it's not simply an objective state of the world. And that's why different actuaries could look at the same set of objective facts and come up with very different actuarial assumptions. In Judge Moss's opinion, which picked up on Judge Lambert's opinion, Judge Moss said that if a major economic shock altered the return profile of the plan's assets before the measurement date but after the plan had issued its annual valuation for the prior plan year, the companies would prohibit the plan's actuary from considering those events when calculating withdrawal liability. And he points out that that's intention with the word reasonable, intention with the statutory word best estimate. And he says, under your view, the actuary would be reduced to admitting that its assumptions were wrong. Do you want to respond to that? Sure, Your Honor. I think that that's an unrealistic view of how interest rate assumptions in this context work because we're talking about retirement payments for two to four decades into the future. Even a shock such as the 2008 financial crisis here, which you think if any market event would change actuarial assumptions, that would. The plan has had the same 7.5 percent funding rate, and this is a point that the Chamber of Commerce makes in its amicus brief, before and after that stock market event. That's still not the kind of event that's going to change investment returns for three to four decades into the future because over, you know, as we saw, five years to ten years, the markets rebounded. So I think it's unrealistic to think that there will be a market event in the final days of the year that the actuary can't take into account if it really is the sort of world-changing event. What about the point about the statutory terms? I think the terms reasonable and best estimate are, you know, hurdles for your position because they don't imply something as specific as what you're articulating. So how do you deal with those two specific statutory provisions? So we read the statute as having two different requirements. The first requirement is a timing requirement that all of the inputs that go into calculating unfunded best benefits must be as of the measurement date. And then there's an additional requirement that the assumptions employed by the actuary have to be reasonable in the best estimate. And if an actuary doesn't comply with both of those things in assessing withdrawal liability, he hasn't fully complied with the statute. But there's a reason why you don't have any retroactivity language in 1393. That's the provision that specifically deals with the actuarial assumptions. But our timing rule applies not only to the actuarial assumptions but to all of the inputs that go into the calculation. One more, which is before the Second Circuit decision, as I understand it, and you mentioned this in your opening, the other side's proposed methodology was commonplace and was in place for several decades. And do you want to respond to that? Yeah, I don't think that's true, Your Honor. All of the arbitrators, the ERISA arbitrators that have dealt with this issue that we're aware of, and this goes back to 2008, have said that changing assumptions after the valuation date is inappropriate. We have the Embassy Industries decision in the Joint Appendix in this case. They're relying a lot on a 2020 issue brief from the American Academy of Actuaries that seems to have been a direct response to the Second Circuit's decision. And they're also relying on the actuarial standards of practice, which the relevant one, number 27, was first released in 1996. So there's absolutely no evidence at all before the Court that before 1996, at the very earliest, actuaries were doing this. And as I said, all of the arbitrations where this has come out have come out our way. How far does your understanding of inputs go? 1393 talks not only about assumptions but also about methods. Indeed, it's used as one phrase, assumptions and methods. So does your argument mean that an actuary also can't update the methods that they use? Well, they can always update them, of course. It's just a question of whether they can apply them in the initial year. I think that methods would be part of the way that the computation is performed. There are additional requirements if the actuary is changing allocation methods. 1394 deals with that specific issue. That doesn't govern the amount of the unfunded vested benefits, however. That governs the proportion of those unfunded vested benefits that are allocated to a particular employer. But I think our general position, and I think we're consistent about this across all the inputs, is that any decision that an actuary or plan makes that will change the amount of unfunded vested benefits has to be made before December 31st. And that really doesn't pose much of a practical problem for plans. If you have a clear deadline, you know how to comply with it. And plans are the ones, of course, who hire actuaries and who can monitor whether or not they are sufficiently updating their assumptions. In this case, there was an ad hoc meeting in January of 2018 where they had a back and forth about what the assumptions should be. It wasn't part of the annual reporting process that the actuary decided to change from 7.5% to 6.5%. It's a very workable rule that we have, which is, if it happens before the end of the year, 1391 is complied with and we can move on. The D.C. Circuit adopted this information available test, which I think is really going to create a lot of litigation and arbitration going forward whenever you have a change in assumptions, because now the actuary will have to be deposed to figure out what exactly they were thinking about, whether what they were thinking about was available in the relevant sense on December 31st, whether they had their blinders on and didn't think about anything that happened after December 31st. And we know that the MPPAA was not designed to give rise to this sort of fact-bound, expensive-to-litigate controversy in withdrawal liability cases. I think the bright-line rule we're suggesting is the best for accomplishing that. But I guess the thing that concerns me a little bit about the rule that you're suggesting is that it seems to focus on or suggest that a change is being made. And you've said that many times. You've said, you know, any decision that will change the amount of the UVB, as though that amount was something that was longstanding, preexisting, established by some other source or whatnot. And I guess I don't know why that's the case. I thought, as you said originally, what is happening here is that when called upon, the actuary is looking at a certain set of facts, hard data about this plan, and making a judgment about how it's going to perform in the future. And for the purpose of the withdrawal liability, it's to tell people how much they need to pay. Why, then, is that a change if it's being done after the planned year? I appreciate that they may have done it the previous year as a part of the annual report or whatnot. But it seems like each time they're doing it, they're making this kind of assessment on the basis of the state of the world at that point. So why the thrust of your rule or the suggestion that you're making seems to be driven by this notion that what's happening is any change that the actuary wants to make has to be done within the planned year. But he's not really changing. He's just looking at what happened in the previous year and making this kind of best judgment, right? Well, respectfully, Your Honor, I disagree with that characterization. I think the idea of a change in actuarial assumptions is well-rooted in ERISA. In the minimum funding provision, which is 29 U.S.C. 1084, one of the things the actuary is supposed to take into account when figuring out the life of the plan's finances over the course of a year is the change in actuarial assumptions that either causes a loss or gives rise to a credit to the plan. That's just the same concept applied for a different substantive requirement. But you're saying he has to do it within the year. The data is still coming in. I mean, isn't he making a judgment about how this plan is going to do? How could he possibly do it reliably and consistently and reasonably if we don't know what has happened for that entire year? Well, in practice, it's because the types of data that change at the end of the year don't have a 10- to 40-year effect on the plan's future experience. And so, you know, whether they have X number of retirees doesn't change how much the plan's investments are going to return. If there were a major change in the plan's investment portfolio, as happens if a plan is about to go insolvent and they need to move everything into cash so they can continue to pay benefits as long as possible, that's the kind of major change that a plan trustee would know about and would be able to tell the actuary in December, January, whenever it happens, look, we're about to make this change and you need to account for it. COVID. COVID's a major change. Let's say it happens in January or February of the year after, and it's going to make a difference, thinks the actuary, in terms of this plan's performance. I think under your rule they would have to ignore that, right, because it didn't happen during the planned year. And I guess how is that consistent with Congress's statement that the actuary is supposed to be making their best judgment? Well, I think even under the D.C. Circuit's rule, if it happens in January, they can't take into account that for the December 31st assumption. That's how I read the D.C. Circuit's information available as of test. I think that if the actuary ever thinks that something significant has happened enough that I need to revise my actuarial assumptions, they can always do that. It doesn't take an end-of-year process. It can happen at any point in time. It doesn't have to happen through particular formalities. And they will do that if there's something so major. But COVID's a great example. The data is still unclear whether COVID has had any long-term effect on life expectancy, and experts go both ways on that, and we're years out from the original event. Under respondents' view, we would be fighting these fights for years into the future because there's nothing in the statute that requires a particular deadline for assessing withdrawal liability. They'd have to do it as soon as practicable, but sometimes in practice that's years down the road. And under their view, even years down the road, the actuary could be revising the actuarial assumptions, even if some employers were charged withdrawal liability under those assumptions for withdrawal during the same year. There's no limiting principle to that argument. And given Congress's demonstrated concern about retroactive changes in such things as the de minimis reduction or switching between allocation methods, and the de minimis reduction in Section 1389 is a question of about $100,000 to a given employer, the idea that they would have been completely unconcerned about millions of dollars of a delta by changing actuarial assumptions is really hard to swallow. Does that, your answer, apply? I mean, as I understand it anyway, we're talking about companies leaving and you're trying to calculate their liability, and let's say the calculation was done under a particular assumption, they fund whatever it is they have to do, and then you find out in January that the numbers were way off, excuse me, because a particular assumption was used when a different assumption should have been used, or because the accounting board issued a new report in January saying, this is how you're supposed to calculate it to get the most accurate determination, not the way you did it. And you still stick with the numbers in January? I think you have to. In December? Yes. I think you have to, Your Honor, otherwise there would be no limits to what information could be factored in retroactively, even years down the road, for an employer who thought they had withdrawn and thought that their liability would be X. It's actually 4 or 5X, depending on the change in assumptions it's made. And I don't think Congress designed the statute to work that way. Well, what if the assumptions that whether the numbers that were used, it turned out to be, you know, grossly unfair, given the more accurate means of determining what those numbers should be that comes in in January? But I think that the numbers we're talking about, again, are like what will the investment portfolio of the plan return over the next 20 to 40 years. Those numbers aren't necessarily fair or unfair. They're supposed to just be neutrally predicting the future, and actuaries do that year to year for all sorts of reasons under ERISA. So they will be aware of what the assumptions should be adjusted to do if there are any assumption changes that need to be made. But usually assumptions, and our friends on the other side admit this, remain stable from year to year. These aren't things we're fine-tuning a little bit here and there all the time. Well, and maybe I'm just repeating the question my colleague just asked. There must be situations where it is a more dramatic change, whether it's COVID or, you know, I don't know, the start of World War II, Pearl Harbor. It seems to me that there ought to be some basis where the assumptions that were made are dramatically different, and the liability is placed on the company as of the time they depart, right? No, as of the date of the end of the prior year. December 31st. Right. Congress chose not to make it the date of the withdrawal, and I think they did that so that every withdrawing employer who withdraws in the same year will be charged the same amount of withdrawal liability. But under a respondent's reading of the statute, there's no reason that has to be so. An actuary can always say, I actually have thought about it further, and I think that the assumptions should be changed, so even though we've already assessed these employers, we're going to assess this new employer, this other employer, a higher amount. That would be perfectly permissible under their rule, and the plan could even hire a new actuary because they don't like the assumptions that have been sent out in the prior bills for a given year. Nothing in their reading of the statute would prohibit any of those things. But you could also challenge those things in arbitration, correct? It's possible to, Your Honor, to challenge. Yes, so there's a mechanism, there's a remedy for the problem that you just addressed. Well, no. I was imagining a scenario where the new actuary sincerely believes the other assumptions are the right ones. But you have the ability in the statute for any assessment of actuarial assumptions to be raised in arbitration. So you have the argument that this is unfair, other people were charged a different rate, this is a new actuary who doesn't know what he's doing. You can raise all of those things in arbitration, right? Yes. And our point is just that we also think that the requirements in 1391 have to be raised as something you can raise in arbitration as well. Thank you, counsel. Justice Thomas. Justice Alito. Counsel, there was no withdrawal liability here that was calculated based on post-withdrawal changes to assumptions, correct? Post-withdrawal changes, in this case, yes. Right, in this case. The Mets case was different. So that's, and two of the four employers you represent got the correct calculation, correct, under the new assumption? They got a, like, the prediction or projection of withdrawal liability. Using the new assumption. Yes. One didn't even ask. And only one who asked the year before got the use of the old assumption, correct? That's correct, Your Honor. All right. You're asking for a rule that they have to use a calculation or an assumption that has been previously arrived at before December 30th, correct? Correct. But the calculation required is as of December 31st. So there will have been and can be changes that occur between that old assumption calculation and even under your best theory, December 31st. So if the old assumption was done the prior summer, the prior January, as of December 31st, some things will have changed. Under your calculation, under your theory, they can't look at that, correct? No, Your Honor. Our theory is that things won't have changed enough to warrant a revision in actual assumption. That's an assumption on your part. But if there is. Reality could be mortality table. If that does happen, they can make the change throughout the end of the year. There's no reason they have to wait until January to make that change. I made this sound like 1399C1A, Roman numeral number 2. There, it requires a determination of the amortization period for paying withdrawal liability to be, quote, based on the assumptions used for the most recent actuarial valuation of the plan. Congress knew how to fix the use of assumptions to a particular date. It didn't do it here. Why shouldn't I assume it didn't mean to do that here? Well, I don't think, in our view, you have to use the last valuation assumptions when assessing or calculating unfunded vested benefits. You could change them in December if you're the actuary. That would be fine. But Congress could have done that. Why should we do it? Well, I think that is what Congress did. And they can't do that in 1399C. As Your Honor was quoting, they have to use something that was previously reported to the government regulators. Thank you. Mr. King. Justice Gorsuch. Justice Kavanaugh. In the Second Circuit opinion, Judge Winter explained that the other side's position presents opportunity for manipulation. Can you just succinctly elaborate on what your concern is on that? Because there's a lot of debate in the amicus briefs on that point. Yes, Your Honor. So under the statute, the assumptions are really supposed to be the client's assumptions, and they're not supposed to be the trustees'  But in practice, and I think JA-175 is illustrative of this, actuaries know their clients have preferences about such things, and so they solicit input from their client, the trustees, on what assumptions would be appropriate for withdrawal liability purposes. In addition to that, which I think is one of the concerns, trustees can also hire a new actuary, as happened in Metz. They had one actuary who had been in place using one set of assumptions for many years, and then after the date of withdrawal, a newly hired actuary came and cut down the discount rate assumption by almost half, and that quadrupled the amount that the employer owed. That could happen under Respondent's rule any time. I think Justice Jackson alluded to this. An employer could still challenge, for example, the switch from 7.5 to 6.5 as being unreasonable or not the best estimate, correct? They could, but it would be difficult in many cases because there's a range of acceptable assumptions that actuaries can use. But they could. I just want to make sure they can. They could procedurally do that. They can and do regularly, maybe not regularly. It's not that regular, actually. Maybe not regularly. I shouldn't have added that. But they can and do that. In theory, they can do that. And then how much money is involved in this case for the four employers? The total amount that they were assessed is about $10 million, and under the correct assumptions, in our view, the amount would have been something more like a third of that.  Thank you. Justice Barrett? Justice Jackson? Thank you, Counsel. Mr. Roberts? No relation? Not at all. Thank you, Mr. Chief Justice, and may it please the Court. I think the issue where the Court is getting caught up on is, as a textual matter, what the phrase, as of, means. Because that's the key phrase in this case. What as of means is that an actuary determines at a later date the financial condition of the plan at an earlier date, the measurement date. So the phrase creates a reference point for performing work at a later date, not a deadline by which the work must be completed. It would be highly unusual for Congress to use a phrase like as of that contemplates work being done in the future to require actuaries to do work like select assumptions before the measurement date. That's just not what as of means. And that's how actuaries have interpreted the phrase for 40 years or so. We have our amicus brief in which the actuaries talk about this. This is well-established practice, selecting assumptions after the measurement date. There are a couple of cases where this comes up. The Combs case that we cite, there's a UMW case that's cited in the HR policy brief. So there's examples where actuaries have selected in the past assumptions after the measurement date. The other thing I'll point out, our reading of as of, that it requires work to be done in the future, not before the reference date, is consistent with how that phrase is used throughout the law. So, for instance, in eminent domain cases, a calculation of the property value is done as of the date of the taking. Well, all of the work is done after that date, including making value judgments and selecting assumptions, including, by the way, selecting a discount rate, because in eminent domain cases, you need to account for the time value of money. So everything that happened in this case, in which the actuaries selected the assumptions a mere three weeks after the measurement date, is consistent with the concept of the phrase as of. It's consistent with longstanding actual practice, and it's consistent with other areas of the law that use the phrase as of. By grounding their assumptions on the plan's anticipated experience as of the measurement date, the actuary did what the statute requires, which is calculate UVBs as of the measurement date. Is there any limit to that, temporally or just volume-wise, quantitatively? A limit in terms of when the assumptions can be selected?  Yes. So the statutory scheme accounts for that. My brother here is talking about, you know, things happening years and years in the future. That's not how it would work under the statute. So first, under Section 1399, the employer has to assess withdrawal liability within a practicable amount of time from the time of the withdrawal. That is a limit. So in order to assess liability, the actuary has to calculate the UVBs, which means the actuary has to select the assumptions. So within a basically reasonable time of withdrawal, the actuary has to select its  There's another built-in limitation in the statute, which the court talked about in the Bay Area laundry case, which is that plans have a strong incentive to assess liability as soon as possible so they can get paid as soon as possible. The statute is set up so that even if an employer wants to dispute the calculation, they still have to pay first, right? This is all about maintaining the solvency of plans and ensuring their survival. And so plans have an incentive to do these calculations quickly, and so that's a second limitation in the statute. The other thing that I'll say is that there are these annual valuations that came up, which the actuary has to select assumptions before it can do these annual valuations. So this idea that it's going to be, you know, ten years in the future that these assumptions are being – that's not how the statute works. The statute has built-in limiting principles to ensure that there is a reasonable time between the measurement date and the date of selection of the assumptions. And Mr. Connealy argued that the D.C. Circuit's rule leads to administrability problems. Is he correct on that? I don't think so, Your Honor. So the issue with the D.C. – so the D.C. Circuit rule that's being referred to is addressing the secondary question in this case, right? So the primary question is, can an actuary – is it permitted to select assumptions after the measurement date? That's the primary question, and our position is yes. The question that follows from that, which you're alluding to, Justice Alito, is what information can the actuary use when making those selections after the measurement date? Is it allowed – does it have to sort of stop its body of knowledge on the measurement date, or can it consider subsequent events? And what the D.C. Circuit said was, you have to stop on the measurement date. So anything that happens after that, the actuary should not consider, even though it's allowed to select its assumptions after the measurement date. I don't think that's an unworkable rule at all. This is the type of thing that actuaries do all the time. They have a given set of data, and they exercise their professional judgment and make projections based on a given set of data. All the D.C. Circuit rule is saying is to, you know, stop the data set at the measurement date. This is the type of thing that we ask parties to do in the law all the time. So, for instance, if there's an issue of whether someone acted reasonably, right? A jury has to consider the facts and circumstances at the time of the action. And it has to put out of its mind the subsequent, you know, potentially years' worth of things that happened in order to decide if the action was reasonable at the time. Even under this statute, the arbitrator, who is – can decide whether the assumptions selected were reasonable, has to think about were they reasonable at the time they were selected. So the arbitrator has to put out of its mind, you know, subsequent events. So I don't think there's anything unworkable about asking an actuary who's trained in exactly this type of, you know, profession to just consider events up through the measurement date. In any event, what you're calling the primary question is the only question before us. Isn't that correct? That's our position, Justice Jackson. Absolutely. The question presented is purely about whether it is permissible to select assumptions after the measurement date. The question – the secondary question on what information can be used, you know, the parties talk about it a little bit in the briefs. Our position is, I think the United States' position as well, is that that question is not presented in this case. There's no circuit split on that issue. And it's not actually an issue that would matter at all to the outcome of this case because, you know, it's a very limited factual record here. But what we do know is that the assumptions here were selected a mere three weeks after the measurement date. And there is no record on this, but it will show eventually, if the other side brings a challenge in arbitration following this case, it will show that nothing happened during that three-week period. So it actually doesn't matter for this case whether the actuary based the assumptions on what it knew on January 1st or if it considered – because it didn't consider subsequent events. Another argument that Mr. Connealy made that concerns me is that your rule will lead to disparate treatment of different employers depending upon the time when they withdraw. So I don't think that's a concern, Your Honor. The way that the statute works is these incredibly complicated calculations are done once per year. And so this is the annual valuation and the UVBs are calculated as part of the annual valuation. And so what happens is when it's time to do the calculations, the actuary selects the assumptions, does the calculations, and then those calculations are used for withdrawal liability for the rest of the year. That's – we're not aware of any case in which someone has then gone back and redone all of those calculations. That's not really the way the statute's supposed to work. We're not aware of any case of that ever happening. You know, could it happen? I'd have to think about that, but it's certainly not the way the statute  That's what I want to know, meaning your rule or the one you want us to announce is they can change it. There's nothing in that rule that would stop them from changing it post-withdrawal. That's correct, Your Honor. All right. So tell me what protects against that gamesmanship. Well, I think the statute already has protections built into it. So any employer who wants to challenge its withdrawal liability assessment can, in arbitration, argue that the assumptions that were used in the calculation were either unreasonable or they don't represent the actuary's best estimate of the plan's anticipated experience. Now, that second prong there, that's a subjective test. The point of that test is if for some reason the actuary was pressured or, you know, made a decision that wasn't based purely on the actuary's professional judgment, well, then there is an avenue for challenging that. So this concern about gamesmanship, the statute already accounts for concerns with gamesmanship. There's already a mechanism in place. But if the general rule is that the actuary can change assumptions, I don't know how we – it then becomes a fact-based fight in every situation. It is a fact – that would be a fact question for the arbitrator. That would be the employer would need to show that there was some sort of improper, you know, impropriety in the selection process. But that's how Congress set this up. Congress – and I should point out, by the way, that the fact that Congress chose actuaries to make these decisions also addresses some of this concern about gamesmanship. Because in the concrete pipe case, the court acknowledged that Congress views actuaries as unbiased professionals who are subject to professional standards, who have absolutely no incentive to come down hard on withdrawing employers. So the mere fact that we have actuaries is a built-in protection in the statute in and of itself. And then you have these additional provisions which Congress put in just in case something, you know, goes wrong in the selection process. If something unfair happens, there is the ability for the employer to challenge the assumptions. Mr. Keneally was suggesting that those challenges aren't often made, that it's a very high bar and that, you know, it's nice that people have that, but it's never going to be used and a lot of manipulation can exist before you get to that point. I don't agree with that, Your Honor. There are cases, the SOFCO case, the Energy West case, in which courts have struck down or asked actuaries to recalculate withdrawal liability because they found that the assumptions were either unreasonable or didn't satisfy the best estimate requirements. So this is not a toothless standard by any means. You said at the beginning your position represented the well-established practice. There was some pushback on that from the other side. Can you just elaborate on how we should think about that?  So what we have in terms of evidence to support that is we have the brief, the amicus brief from the four largest actuarial firms who work in this space, and they say that this is a longstanding practice. We cite in our brief to an issue brief by the Academy of Actuaries in which they say this is how we've always done it. The other side hasn't put any evidence to contradict any of that. I also would point out just the two cases. The reason there's not a lot of case law on this timing issue because everyone knew this wasn't an issue until METS came up. All the actuaries selected the assumptions after the measurement data. Nobody thought twice about it. It's only been since METS that this has become something that people talk about. So there's not a lot of case law that talks about the timing. What we've been able to find are a couple of cases where just in the background section it tells you when the assumptions were selected. And the Combs case, if you look at the district court version, we cite the Combs case in our brief. You have to go to the district court decision. That shows that the actuary selected the assumptions after the measurement date. Nobody complained because that was standard practice. And that, by the way, was back in, I believe, 1981 or 1982, just a couple of years after the statute was passed. There's another case that we found recently. It's cited in the HR policy amicus brief. It's the UMW case. And you have to dig through the record a little bit, but it shows that in September of 2014 the actuary selected assumptions for a June of 2014 measurement date. So three months after the measurement date. Again, nobody complained about the timing because everyone understood this is what it means to calculate something as of a measurement date. You're casting METS as essentially creating the problem. I understand your position on that. Judge Winter, who wrote that opinion, very wise judge, very knowledgeable about these kinds of topics. So how did that get off track in your view? I mean, I think what METS should have done, right, the facts in METS on their face looked bad, right? The plan replaced its actuary, and then the new actuary came in, and the new interest rate used by the new actuary was dramatically different, right? And all of that happened after the employers had withdrawn, right? All the facts looked really bad in that case. We don't have any of those facts in our case, right? So it's a bad facts case. I think so, and I think the right approach, I mean, the reason it went off the rails was because the arbitrator is the one who came up with the timing rule, and then it went up on appeal, so that was the question in front of the Second Circuit, is whether there was this timing rule. I think the proper approach would have been to send it back to the arbitrator and tell the parties to use the mechanisms that Congress gave them. Congress would allow the employer to argue that something improper happened in the selection process. The plan had some, you know, had its hands all over this, you know, firing the actuary, whatever. Bring that kind of a challenge, which they're allowed to do in arbitration. Argue that the new rate is unreasonable. You're allowed to do that in arbitration. That's what should have happened in METS. I think, you know, that's just my view on that. Instead, it came up with this rule that's completely atextual. I think it's very interesting that if you read the METS opinion, METS doesn't rely on the as-of language. It's not, there's really no textual holding at all in METS. It's all about this idea that the legislative history of Section 1394, which doesn't even deal with assumptions, you know, shows some general congressional interest in anti-retroactivity. It's exactly the opposite assumption that you would make normally when doing statutory construction. So there are lots of problems with the METS decision. Anything further? No. Thank you, Counsel. Thank you. Mr. Barber. Mr. Chief Justice, and may it please the Court, for decades pension plan actuaries have selected their assumptions for withdrawal liability after the measurement date, until the Second Circuit in METS became the first court to prohibit that practice. That decision is wrong, as various provisions of ERISA make clear. Section 1391's as-of language plainly contemplates a retrospective determination of withdrawal liability, and nothing in that section suggests a different rule for the underlying actuarial assumptions. Section 1393 explicitly governs the actuarial assumptions for withdrawal liability without saying anything about timing, whereas Section 1394 explicitly addresses retroactivity without saying anything about the assumptions. Petitioner's policy concerns lack merit as well, particularly in light of the longstanding contrary practice, and could not justify their timing rule anyway. This Court should abrogate METS and affirm the judgment below. I welcome the Court's questions. Do you agree with Respondent that there wasn't a problem until METS came along? I do agree, and I would say to the point that was just being discussed about the extent to which this was common practice, we have all the evidence that my friend Mr. Roberts mentioned, but we also have evidence from other fields. All the various standards that we cite from the accounting field, appraisal field at page 17 of our brief, talk about how it's appropriate in some circumstances to rely on events post-dating the evaluation date or the date of the relevant assessment in formulating the kind of estimates and indeterminate inquiries that go into any kind of financial model or any kind of assessment. So that's consistent with the general practice that Mr. Roberts was You say that things were working well before METS. Have very serious practical problems emerged since METS, or is it simply a matter of the fact that actuaries were used to doing things in a particular way and they don't want to change the way they've been doing it? I think it may be too early to tell, Justice Alito. These cases do tend to move rather slowly through arbitration, so it's hard to say how disruptive the METS rule has been. But METS's rule does necessarily deprive actuaries of the ability to account for certain year-end information that becomes available only after the measurement date, so it's clearly disruptive in that sense. It's also disruptive potentially in the sense that it requires actuaries to use necessarily stale assumptions. So here petitioner's position is that the actuary was obliged to rely on actuarial assumptions that had been employed in November of 2017. Although November 2017 is only a little bit before the measurement date here, those assumptions were keyed to the measurement date from the previous plan year, so the end of 2016. So one of the upshots and one of the anomalies in petitioner's position is that it would require the use of stale assumptions, which, as we discussed in our brief, is inconsistent with Section 1393's best estimate requirement. You can understand, can't you, how an employer, though, might not appreciate if the discount rates changed after the withdrawal and jams them with many millions more dollars in withdrawal liability. I certainly appreciate that, Justice Kavanaugh. A couple things on that. The decision to withdraw might be based in part on how much that liability is. Yes. So first of all, one thing to note is that petitioner's position is limited, their proposed timing rule is limited to the actuarial assumptions. So they accept the fact that all the other inputs into the withdrawal liability determination. Got that. But the discount rate change itself could have many millions of dollars in impact for the withdrawing employer, correct? That's certainly true. I think another important provision here is Section 1021L. That's the provision that entitles each participating employer in the plan to an estimate of the withdrawal liability that would be assessed. But I think it's quite important that that provision posits that the relevant employer withdrew in the previous year. So it's two years. Correct. Two years before. The reason why, Justice Kavanaugh, I think it's important is that it suggests that Congress intentionally chose not to force plans and their actuaries to prematurely select their assumptions too early in the year simply because an estimate request has been made. PBGC, what's going on with the proposed rule? So as far as I know, it remains pending. It does not go to the decision. Any sight, any likelihood of an end to that? I don't know. Don't say what you can't, but what can you tell us on that? Well, whenever you have like a presidential transition, that affects the timeline for these things and rules do often gestate for quite a while. For present purposes, the rule, at least as it was proposed, would have no impact on the issues in this case because it wouldn't affect the timing. It would affect the substantive range of permissible discount rates to use, and that would be promulgated under a different provision of Section 1393 than the one that we're dealing with here. I just wanted to add one quick point. I think I can offer the Court a pretty basic hypothetical to show why petitioner's position can't be correct. If I were determining my life expectancy as of 2025, that's one of the most basic actuarial assumptions you can make. I would have my choice of which mortality table to use. Mortality tables can vary in all kinds of ways. Demographically, they can be limited to men versus women, blue-collar versus white-collar workers. The mere fact that I made my choice of table in 2026 does not mean that I was failing to comply with the as-of requirement of the inquiry. And as long as you accept that, petitioner's position simply cannot be correct. It all turns on the meaning of as-of, and as Mr. Roberts was explaining, that's not what as-of means. Thank you, Counsel. Thank you. Rebuttal, Mr. Konevy. Thank you, Mr. Chief Justice. I want to start with Mr. Roberts' point about there actually being a timing guardrail under their reading of the statute. That as soon as practicable language from 1399C is not much of a guardrail at all, there are cases, including the Huber case, as this court described, in Milwaukee Brewery, where two and a half years passed between the withdrawal and the assessment. And that two and a half years, a lot can happen. A new actuary can come in and think very sincerely that their own best view about what the plan's anticipated experience will be requires a much lower discount rate. And under their reading of the statute, that new actuary's views would have to control, because that's what that actuary's best estimate would be. I think that the administrability of our rule in comparison to theirs is evident just from looking at the facts of this case. I think that Mr. Roberts said that the actuary's assumptions have to solely be that actuary's own judgment about the plan's anticipated experience. But here, the actuary's own presentation to the trustees reflected that the actuary wanted the trustees' input on how to calculate withdrawal liability. If we lose here on remand, we will have to litigate. We will have to depose the actuary and figure out what exactly happened in that meeting and whether that actuary's views were affected at all by that meeting. And because the actuary actually went into the meeting proposing either a 7.5 percent rate, which had not been modeled in the presentation at all, will give rise to problems, that's just one example of the fact-based litigation that will be necessary under my friend on the other side's view of the statute. And that won't be just in this case. It will be in all the cases going forward where there's a change. I think it's not a surprise that the four largest actuarial firms are in this court advocating for plan flexibility. The plans are the ones who hire the actuarial firms and obviously would prefer to have that flexibility as well. Concrete Pipe did describe actuaries as neutral experts, but they're not immune to client pressure, as Professor Naughton describes in his amicus brief. And indeed, the trustees are, as Concrete Pipe describes, individuals with a statutory role and fiduciary obligation to look after the benefits of the plan. And that can readily, and in good faith, lead them to choosing actuaries that will increase withdrawal liability. I think one of the reasons why there haven't been many cases and one of the reasons why I disagree with Mr. Roberts' characterization that withdrawal liability assumptions have often been changed after the measurement date is because actuarial assumptions tend not to change at all. And I think that if we had seen anything to the contrary, the brief in opposition and the cert stage brief by the government wouldn't have admitted that actuarial assumptions hardly ever change. The facts of METS did look bad, but there's nothing in the D.C. Circuit's rule, let alone the broader rule that my friends on the other side really prefer, that would prevent the facts in METS from reoccurring anytime a plan decided that it wanted to come down hard on withdrawing employers in the future. There haven't been any problems since METS. I think that the best evidence of that claim is the brief in opposition, pages 16 through 17, and then the supplemental brief filed by respondents at two and four. They say that the plans and actuaries can readily comply with the clear rule that METS sets. The scenarios where actuarial assumptions change and require or need to be changed in order to deal with changes in mortality are very rare, and there aren't any concrete examples of that in front of the court. To answer your question, Justice Kavanaugh, about the PBGC rule, I think it's important to recognize what that rule is proposing. That rule is proposing to give a range of assumptions that can be selected in any circumstances so that the safeguards that my friends identified, reasonableness, best estimate of anticipated experience, those wouldn't be implicated any longer if the PBGC rule is enacted. That rule would abrogate the SOFCO case that Mr. Roberts cited as his example for how those standards have teeth. The PBGC rule would replace that part of the statutory inquiry, and the only thing that could protect an employer from getting a surprise bill months or even years after the withdrawal would be the timing rule that we argue is already inherent in the as-of language in Section 1391. Thank you. Thank you, counsel. The case is submitted.